## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA,
STATE OF FLORIDA,
and *ex rel.* NANCY CHASE,

    Plaintiffs,

Civil Action No.: _____

v.

HPC HEALTHCARE, INC., a Florida
corporation, LIFEPATH HOSPICE, INC.,
a Florida corporation, and GOOD
SHEPHERD HOSPICE, INC., a Florida
corporation,

    Defendants.

**FILED UNDER SEAL
PURSUANT TO 31 U.S.C.
§ 3730(B)(2)**

**DO NOT PLACE IN PRESS BOX
OR ENTER ON PUBLICLY
ACCESSIBLE SYSTEM (PACER)**

_____/

## FALSE CLAIMS ACT COMPLAINT
## AND DEMAND FOR JURY TRIAL

### I.   INTRODUCTION



1.    This is an action to recover treble damages and civil penalties in excess of $900
million, on behalf of the United States of America arising from false statements and claims made
or caused to be made by the Defendants to the United States and its agents and intermediaries in
violation of the False Claims Act, 31 U.S.C. § 3728 *et. seq.* (the "Act"). The Defendants
knowingly made, used or caused to be made or used false records and statements material to
false or fraudulent claims for payment in connection with hospice services.

2.    Relator, Nancy Chase, ("Relator") brings this action on behalf of the United States
of America against Defendants HPC Healthcare, Inc., LifePath Hospice, Inc., and Good
Shepherd Hospice, Inc., for treble damages and civil penalties for their violations of the Act.

3.      Prior to the filing of this Complaint, and required by the Act, 31 U.S.C. §

3730(b)(2), Relator has previously provided to the Attorney General of the United States and to

the United States Attorney for the Middle District of Florida a Sworn Disclosure Statement

containing all material evidence and information related to this complaint.   The Sworn

Disclosure Statement is supported by material evidence known to the Relator establishing the

existence of Defendants' false claims.   Because the Sworn Disclosure Statement includes

attorney-client communications and work product of Relator's attorneys, and is submitted to the

Attorney General and to the United States Attorney in their capacity as potential co-counsel in

the litigation, the Relator understands this disclosure to be confidential.

## II.    PARTIES, JURISDICTION AND VENUE

4.      This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.*  This

Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1345; and 31

U.S.C. § 3732(a).

5.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts

proscribed by 31 U.S.C. § 3729 and complained of herein took place at health care facilities,

hospice houses and patient/family homes located in the Middle District of Florida, and is also

proper pursuant to 28 U.S.C. § 1391(b) and (c) because at all relevant times Defendants

transacted business in the Middle District of Florida and throughout the nation.

6.      Relator, Nancy Chase, MSW, LCSW, has been employed with LifePath Hospice,

Inc. since 1992 (18 years).  She has served as a Social Services Specialist at LifePath Hospice,

Inc.'s Tampa office and in home settings from 2009 to present.

2

7.     Before serving as a Social Services Specialist, Ms. Chase worked in the superior position of Psychosocial Consultant (and it's equivalent) at LifePath Hospice, Inc's Tampa and Temple Terrace offices from 1994 to 2009.  In 2009, she was demoted, even though she had previously received an outstanding recommendation from the Chief Medical Officer and Executive Vice President, Dr. Ronald S. Schonwetter **(see Ex. #1)**, because she raised ethical issues concerning violations of the Act.  Ms. Chase was also discharged from the Ethics Committee and the IDG Committee (Policy and Procedure Committee) in February 2010, after raising ethical violations by LifePath Hospice, specifically for not honoring a patient's Living Will (patient battery) and for wrongfully discharging a patient.

8.     Ms. Chase's demotion and her removal from the Ethics Committee, as stated above, were discriminatory actions by an employer in violation of 31 U.S.C. § 3730(h).

9.     Defendant HPC Healthcare, Inc., is a Florida not-for-profit corporation formed under Florida law to provide hospice and palliative care and services.  Its principal place of business is located at 12973 Telecom Parkway, Suite #100, Temple Terrace, Florida 33637.  HPC Healthcare, Inc. is the parent company of Defendants LifePath Hospice, Inc. and Good Shepherd Hospice, Inc.

10.     Defendant LifePath Hospice, Inc. is a not-for-profit corporation formed under Florida law to provide hospice and palliative care and services.  It is located in Hillsborough county and has three offices viz. two offices in Tampa and one office in Sun City Center, Florida.

11.     Defendant Good Shepherd Hospice, Inc. is a not-for-profit corporation formed under Florida law to provide hospice and palliative care and services.  It is located in Polk, Hardee and Highlands counties and has 6 offices.

3

### III.   ALLEGATIONS COMMON TO ALL COUNTS

#### A.   MEDICARE AND MEDICAID PROGRAM REQUIREMENTS

12.   Hospice care is an approach to caring for terminally ill individuals.  Hospice services are intended to provide comfort and pain relief for dying, as opposed to curative care which seeks to reverse the underlying disease or condition.

13.   Hospice services may be provided in a patient's home, a hospital, a nursing home or private hospice facility.

14.   In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare") to pay for the cost of certain medical services for persons aged 65 and older, certain persons with disabilities and persons with kidney failure.

15.   The U.S. Department of Health and Human Services ("HHS") administers the Supplementary Medical Insurance Program for the Aged and Disabled ("Medicare") through the Centers for Medicare & Medicaid Services ("CMS"), a division of HHS formerly known as the Health Care Financing Administration ("HCFA").

16.   The Medicare program has two parts: Medicare Part A ("Hospital Insurance Program"), which provides for care in or by institutional providers, such as hospices, within specified limits, *See* 42 U.S.C. § 1395c, *et seq*.  Medicare Part B ("Supplemental Medical Insurance Program"), which pays for physician services and a variety of outpatient services. *See* 42 U.S.C. § 1395j, *et seq*

17.   In order to participate in the Medicare program, a health care provider must enter into an agreement ("Provider Agreement") with the Secretary of HHS.  § 1395cc.  After entering into a Provider Agreement, Medicare directly reimburses the provider for the reasonable cost of services provided to Medicare patients.

4

18.    Under Medicare regulations, the term "provider" means a hospital, a critical access hospital, a skilled nursing facility, a comprehensive outpatient rehabilitation facility, a home health agency, or a hospice that has in effect an agreement to participate in Medicare, "or a clinic, a rehabilitation agency, or a public health agency that has in effect a similar agreement but only to furnish outpatient physical therapy or speech pathology services," or a community mental health center that has in effect a similar agreement but only to furnish partial hospitalization services.  42 CFR § 400.202.

19.    A provider must comply with the requirements of the Medicare and Medicaid programs in order to be eligible to receive payments from these programs for hospice services.

### B.    FALSE CLAIMS ACT

20.    Federal law prohibits knowingly presenting or causing to be presented a false or fraudulent claim for payment from the United States Government.  It is unlawful to conspire to defraud the Government by getting a false or fraudulent claim allowed or paid.

21.    The Act, at § 3729, provides in pertinent part that:

> (a)    Any person who (1) knowingly presents, or causes to be presented to an officer or employee of the United states Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; ... or (4) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person
> * * *

> (b)    *For purposes of this section, the terms "knowing" and "knowingly" mean that a person without respect to information (1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. §3729.*

22.    On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act ("FERA"), which amended 31 U.S.C. § 3729(a)(1) and (a)(2), which became § 3729(a)(1)(A) and (a)(1)(B), respectively.  After the FERA amendments, § 3729(a)(1) currently provides liability for any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

§ 3729(a)(1).

23.    Under the FERA amendments, liability under § 3729(a)(1)(A) or (C) applies to all conduct by the Defendants which occurred after the date of the FERA enactment, May 20, 2009. For liability for false claims under § 3729(a)(1)(B), FERA provides that this provision applies retroactively to all false claims made by Defendants which were pending on or after the date of June 7, 2008.

## C.    ELIGIBILITY FOR HOSPICE CARE

24.    The IDG (Interdisciplinary Group) is responsible for participation in the establishment of the plan of care, provision or supervision of hospice care and services, periodic review and updating of the plan of care for each individual receiving hospice care, and establishment of policies governing the day-to-day provisions of hospice care and services.  42 C.F.R. § 418.68(b).

25.    Medicare regulations require that a hospice maintain a clinical record for each patient.  42 C.F.R. § 418.74.

26.    Each patient's clinical record must contain 1) the initial and subsequent assessments; 2) the plan of care; 3) identification data; 4) consent and authorization and election forms; 5) pertinent medical history; and 6) complete documentation of all services and events (including evaluations, treatments, progress notes, etc.).  42 C.F.R. § 418.74(a).

27.    A patient's clinical record must be sufficient to support MHB (Medicare Hospice Benefit) claims in that it must contain documentation to support the patient's prognosis at the time of each re-certification that the patient has a terminal disease and has 6 months or less to live if the disease runs its normal course.

28.    Medicare regulations define Terminally Ill as "the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." 42 C.F.R. § 418.3.

29.    The MHB is divided into the following benefit periods: 1) the initial 90-day period; 2) one subsequent 90-day period; and 3) 60-day benefit periods.   42 U.S.C. § 1395d(a)(4).

30.     In the initial 90-day benefit period, the individual's attending physician and the medical director or physician member of the interdisciplinary group of the hospice program providing or arranging for the care must each certify in writing at the beginning of the period that the patient is Terminally Ill.  42 U.S.C. § 1395f(a)(7).

31.     After the initial certification, a physician must re-certify that the patient is Terminally Ill and re-certify at the beginning of a second 90-day period and every 60 days thereafter.  42 U.S.C. § 1395f(a)(7).

32.     The certification or re-certification "must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course."  42 C.F.R. § 418.22.

33.     Under the Medicare program, the accurate and truthful certification and re-certification by a physician of a beneficiary's eligibility for the MHB at the beginning of each benefit period is material to entitlement and payment of the MHB by Medicare.  42 U.S.C. § 1395f(a)(7).

34.     The written certification for eligibility for a hospice election must include:

(a)     The statement that the individual's medical prognosis is that their life expectancy is six months or less if the terminal illness runs its normal course;

(b)     Specific clinical findings and other documentation supporting a life expectancy of six months or less; and,

(c)     The signature of the physician.

The hospice facility must retain all certification statements.

### D.     DEFENDANTS' SCHEME TO DEFRAUD THE UNITED STATES GOVERNMENT

35.     . Defendants HPC Healthcare, Inc., LifePath Hospice, Inc., and Good Shepherd, Inc., are and have been from at least June 2000 to the present, engaged in a scheme to over-

8

charge the Medicare and Medicaid programs for hospice services.  Defendants routinely, and as a pattern and practice, presented and caused to be presented false and fraudulent Medicare and Medicaid claims for payment in violation of 31 U.S.C. § 3729(a) and Florida Statutes § 68.082(2) by knowingly submitting false or fraudulent claims to Medicare and Florida Medicaid for hospice services which did not meet professionally recognized standards of health care.  In summary, the fraud consists of the following acts, committed by Defendants from at least June 2000 through the present date:

(a)      Defendants knowingly submitted false claims for payment, and false documents, in order to obtain approval for enrollment and payments for hospice care benefits for patients who were not properly qualified as being terminally ill under 42 U.S.C. §1395;

(b)      Defendants improperly induced patients who were entitled to Part A of Medicare to elect hospice care without being properly certified as terminally ill, and knowingly submitted false claims to Medicare for payment for such patients;

(c)      Defendants knowingly and falsely certified patients to receive hospice care who were not eligible for Medicare reimbursement in order to falsely inflate numbers of patients eligible for hospice benefits and knowingly submitted false claims for payment for such patients.

(d)      Defendants knowingly submitted false clams for payment by routinely making and being paid for services for a higher level of care than was medically necessary.

(e)      Defendants knowingly submitted false claims for payment by routinely billing Medicare for services while the patient was out of the relevant service area.

(f)      Defendants knowingly submitted false claims for payment by billing Medicare for services not actually performed.

9

(g)     Defendants knowingly submitted false claims for payment by billing Medicare for services in accordance with a patient Plan of Care, which Plan could not be followed due to intentional understaffing by the Defendants.

(h)     Defendants knowingly submitted false claims for payment by billing Medicare for patients who were referred to Defendants pursuant to an illegal kickback scheme with nursing homes and assisted living facilities.

(i)     In furtherance of the fraud, Defendants demoted and discriminated against Relator for her disclosure of the fraud to her employer and reporting of other ethical violations.

36.     Defendants' actions not only defrauded taxpayers but compromised patient health by causing non-terminal patients to forego vital curative treatment.

37.     As a result of Defendants' above actions Defendants wrongfully obtained tens of millions of dollars from the United States that they were not entitled to receive.

## E.     ADMITTING AND RETAINING PATIENTS WHO DO NOT QUALIFY FOR MEDICARE SERVICES

38.     HPC Healthcare, Inc., with the aid of its subsidiary companies LifePath Hospice, Inc. ("LifePath"), and Good Shepherd, Inc., ("Good Shepherd"), has consistently admitted patients who are not eligible for admission under Medicare criteria. Staff at LifePath and Good Shepherd have specifically been instructed by management to admit patients who are not appropriate for admission under Medicare criteria with the understanding that an assigned team of staff would be responsible for obtaining supporting documentation of appropriateness within the first ninety (90) days of admission. (See Ex. #2, p. 19-20). HPC has a current Average Daily Census of approximately 2,000 patients, which means there are 2,000 patients receiving hospice care by HPC and its subsidiaries on a given day. Relator estimates that 33% of the 2,000

10

ADC admitted to LifePath and Good Shepherd were not qualified for admission under Medicare criteria.

39.     HPC Healthcare, Inc., with the aid of its subsidiary companies LifePath and Good Shepherd, has routinely delayed patient discharges in order to continue billing their fraudulent charges to Medicare. Defendants intentionally prolong the process of determining whether a patient no longer requires hospice care--a process called non-recertification--in order to inflate their charges to Medicare. **(See Ex. #2, p. 33; Ex. #3, p. 22-34; Ex. #4, p. 1-10)**. For instance, Relator knows that Defendants' Chief Medical Officer, Dr. Ronald Schonwetter, instructs staff that no patient be considered for non-recertification before ninety (90) days have elapsed, even when it is obvious on the very first day that the patient does not meet the Medicare requirements for hospice care. **(See Ex. #2, p. 20; Ex. #4, p. 24)**. Sometimes the patient is not appropriate on the first day, and sometimes the staff determines the patient is no longer appropriate within a month or two; however, HPC has mandated they not be discharged prior to the 90 day recertification period in order for HPC to benefit from the full billing cycle. This mandate was made with the intention to defraud Medicare by increasing the bills submitted to Medicare and receiving reimbursement of these artificial bills for hospice care for patients who did not meet Medicare criteria. This wrongful and illegal practice has resulted in Defendants charging Medicare several millions of dollars for ineligible patients. If and when a patient is finally non-recertified he or she  is often re-admitted within weeks or months, only to be mandated to stay in the program for the 90 day recertification period once again. In fact, a program called Transitions was specifically created to track patients after they have been non-recertified. The explicit purpose of the creation of Transitions was to re-admit non-recertified patients as soon as possible in order to continue to exploit them as a Medicare reimbursement revenue source.

40.     One very clear incident of HPC pressuring their staff to keep patients that are not appropriate under Medicare criteria is when a primary nurse stated during a team meeting in which Relator was present, that a particular patient was not appropriate for hospice, had no symptoms and had improved since his admission. The team physician said not to mention in the patient's record that the patient was not appropriate for hospice because they could just leave out the facts that showed a patient was not appropriate and simply document only the elements that would make it appear as if the patient was appropriate. **(See Ex. #2 p. 34).** The physician repeatedly stated in Relator's presence that "The administration of HPC is putting pressure on the physicians to keep patients even if they are not appropriate!"

41.     Relator witnessed Defendants employees inducing enrollees to elect hospice benefits that were not terminally ill or entitled to hospice benefits. **(See Ex. #5).** These actions have caused the Government, through Medicare, to pay for hospice benefits and at CAPS (or PIPS) rates that were falsely and fraudulently inflated and submitted by Defendants.

42.     Another example of this fraudulent re-certification involves a patient of Relator's with patient ID 198320. A screen shot printout of patient 198320 billing record is attached as **Exhibit #6.** As reflected in this exhibit, this patient was initially admitted to LifePath on November 14, 2007 and then discharged on May 16, 2008. Six days later, the patient was re-admitted to LifePath on May 22, 2008. The patient remains at LifePath currently and is a patient of Relator's.

43.     Relator was present at a team meeting in September, 2009 during which this patient's hospice status was discussed. In discussing this patient's eligibility for continued hospice care, LifePath's Medical Director stated, in Relator's presence, that this patient "should never have been admitted to hospice in the first place" and was not eligible for continued care.

12

However, this patient continues to receive hospice care to the current date. LifePath has billed Medicare on a per diem basis during the time this patient has been admitted to LifePath. (See Ex. #7). Relator has personal knowledge of many other cases similar to patient 198320, in which both LifePath and Good Shepherd have billed Medicare for patients who clearly do not meet Medicare requirements for the MHB.

      44.    Relator has witnessed first hand that Defendants have used several nursing home facilities in the Tampa area to improperly and fraudulently enroll patients to elect hospice care benefits who were not terminally ill and not eligible for such benefits. Defendants have targeted nursing homes and assisted living facilities to gain access to records for patients whom they would sign up or enroll to elect hospice benefits who were not terminally ill or eligible for such benefits. The Defendants placed into effect a plan and scheme to do whatever it took to get more enrollees who would elect hospice care benefits and to attempt to make them fit eligibility while knowing or having reason to know that the majority of these patients were not terminally ill or eligible for hospice care benefits. This plan by the Defendants was implemented solely and simply to increase the numbers of enrollees for the financial benefit of Defendants. (Ex. #10, p. 14).

      45.    Relator believes that the above-described fraudulent scheme is a system wide problem throughout the offices of Defendants in four different counties. Defendants earn a majority of their income from the election of hospice care benefits and this fraudulent and deceitful scheme was intended to and caused the payment of claims, amounts and benefits which were false or fraudulent.

46.    Relator gained direct and independent knowledge of the above mentioned false claims by working as a Psychosocial Consultant for Defendants. Her knowledge was gained by actual experience in LifePath and by talking with other similarly situated employees employed at Good Shepherd.

F.    **SUBMITTING FRAUDULENTLY INFLATED BILLS TO MEDICARE FOR REIMBURSEMENT**

47.    HPC Healthcare, Inc., with the aid of its subsidiary companies LifePath and Good Shepherd, has consistently billed Medicare for a higher level of care than is medically necessary. Relator recalls clinical managers, nurses and staff being pressured to refer patients to the Continuous Care Department and the Hospice Houses regardless of whether the patients qualified for that level of expensive care. While the 2009 Routine Home Care Federal reimbursement rate was $139.97 per day and Inpatient Respite Care had a Federal reimbursement rate of $144.79 per day, Continuous Care had a 2009 Federal rate of $816.94 per day and Hospice House (otherwise known as General Inpatient Care), had a reimbursement rate of $622.66 per day, resulting in significant cost to Medicare when patients were fraudulently provided Continuous Care or Hospice House care unnecessarily. According to the Centers for Medicare Services, "a hospice that is providing all required services for their patients is not going to get 'rich' from their per-diem reimbursements. Any hospice that shows huge profits must be committing Medicare fraud by limiting services to their patients. Good business management will allow a hospice to break even and pay for the services required, but not result in huge profits." **(See Ex. #11, Center for Medicare Service Information Sheets).** Due to HPC's systematic and continuing fraudulent schemes, HPC showed 2009 revenue of over $150 million dollars.

14

48.     Defendants even pressured Clinical Managers and nurses by establishing weekly quotas that a certain number of referrals be made to the Continuous Care Department and the Hospice Houses.  **(See Ex. #5, Letter from Clinical Manager Jodie Rubio, R.N. and text message from Kim Lawrence). (See Ex. #2, p. 32 and Ex #12).**  One Regional Director also received a tremendous amount of pressure from senior management because she would not coerce, threaten and badger her managers and staff to provide fraudulent referrals for Continuous Care. The Regional Director was eventually forced out because she did not want to commit the fraud that Defendant expected of her and of her staff. Similarly, clinical managers, nurses, and other staff, including Relator, have also been pressured to place patients in the Continuous Care Department and Hospice Houses upon discharge from a hospital, regardless of whether the patient qualified or required such a high level of care **(See Ex. #13, See letter from Nurse Terri Jackson).**  Some patients have even expressed that they have felt kidnapped because they were not allowed to go home and instead were made to go to the Hospice House. **(See Ex. #2, p. 32, 33, 35).**  Mandates to fraudulently place patients in these high reimbursement programs came from the higher levels of management, such as: Vice President of Compliance, Peggy Madill; Vice President of Clinical Services and Education, B. J. Dudney; and, Executive Director, Cheryl Hamilton.   Relator has witnessed this coercion and pressure during her employment with LifePath.

49.     Defendants also routinely submitted fraudulently inflated bills to Medicare for services during a time period when a patient was out of the country or out of the service area and did not receive care.  By not discharging the patient or not arranging for services to be provided and paid for by another provider, Defendants continued to fraudulently bill and received payments for the out of town patient being cared for by Defendants.  Relator recalls a specific

instance in which a patient travelled out of the country for three weeks but was never discharged from LifePath. LifePath billed Medicare for care provided to this patient even during his three-week absence from the service area. **(See Ex. #2, p. 6, 32 and Ex. #14).** Relator knows of and has witnessed many similar instances.

      50.      HPC Healthcare, Inc., with the aid of its subsidiary companies LifePath and Good Shepherd, routinely submitted false claims to Medicare and Medicaid for reimbursement for services which it did not provide. Because HPC Healthcare, Inc. and its subsidiary companies are hospices, they are reimbursed by Medicare and Medicaid on a per diem basis for each patient of approximately $4300 per month. This per diem payment covers the cost of staff (including nursing, counseling, home health aide and chaplain services), equipment, medications (such as anti-depressant medicines), and medical supplies (such as diapers and chux). Hospice is responsible for paying for these items whether a patient is at home, in a nursing home, or in an assisted living facility since it is reimbursed on a per diem per patient regardless of the patient's geographical location. Defendants knowingly allowed nursing homes and assisted living facilities to provide the counseling services and anti-depressant medication and bill Medicare for it, even though Defendants were obligated to provide that service to their patients since Defendants were already being reimbursed by Medicare for those services. Defendant allowed nursing homes and assisted living facilities to wrongly bill Medicare because in doing so, the Defendants would lower their costs and increase their profit margins. Defendants knowingly defrauded Medicare by billing for these services which they did not provide and for which Defendants knew nursing homes and assisted living facilities were also billing Medicare. Through this double billing Defendants saved thousands of dollars a month by not providing these services to their patients in nursing homes and assisted living facilities. Thus, as part of

Defendants scheme to defraud Medicare, the federal government is being double billed for these items. **(See Ex. #2, p. 36).** Relator, nurses, clinical managers and other staff are well aware of this shell game of billing fraud since it occurs on a daily basis with explicit instructions and articulated rationales by Diana Yates, Director of Clinical Services, and other senior level directors at both LifePath and Good Shepherd. When Relator raised this issue of double billing Medicare, Diana Yates reprimanded the Relator and told her it was none of her business.

51.    HPC Healthcare, Inc., with the aid of its subsidiary companies LifePath and Good Shepherd, intentionally withheld documentation from its Medicare fiscal intermediary, Palmetto GBA, when it indicated that a patient was improving. **(See Ex. #5 and Ex. #2, p. 33).** Relator knows that at some point all staff were trained to "document to decline," meaning that they were only to document a patient's declining health condition and to not document any improvements that they observed. Specifically, staff are trained never to use the phrases "no longer terminally ill" or "non-recert" when documenting patients. **(See Ex. #2, p. 44-46).** The previously referenced exhibit shows notes taken during a power point presentation by a nurse who was attending this meeting and who documented notes of what Defendants were teaching their staff. The instructions to not document patient improvement (i.e. "document to decline") were mandatory and were taught to the staff upon instruction by HPC's corporate headquarters via HPC's Education Department. This "document to decline" was a newly implemented fraud by Defendants after they realized that if they only "documented to decline" then they could avoid being caught overcharging Medicare for patients that improved and that were not hospice appropriate **(See Nurse Margo Carlson's notes, Ex. #14).** Another similar incident of this fraud occurred in 2009 where a counselor asked Diana Yates, Director of Clinical Services, whether she should document that her patient was riding a bike around the neighborhood.   Relator

observed that Diana Yates refused to respond with a "Yes" (in front of the 30 person staff) as the appropriate/correct response should have been, according to Medicare rules and laws. Her silence, indicated to those present, including Relator, that a counselor should not document that patient's activity. This manipulation of information presented to Defendant's fiscal intermediary resulted in another type of fraud taught in the education seminar, **"frequent visits blinds the decline" (See Ex. #2, p. 45)** which encourages staff to visit as infrequently as possible, because infrequent visits not only save costs for the Defendants (i.e., the costs of hiring the staff), but with minimal contact/care/visits the patient's health is most likely to decline and allow for the counselor/nurse/home health aid/social worker to recognize and therefore document only the decline in the patient's health. This ongoing fraudulent and unethical practice as taught and implemented by Defendants, is unjustly enriching the Defendants, harming their patients, and wrongfully costing Medicare and the taxpayers of the United States hundreds of millions of dollars in false and fraudulent claims.

52.     HPC Healthcare, Inc., with the aid of its subsidiary companies LifePath and Good Shepherd, has, in order to increase reimbursement payments from Medicare, committed battery to patients by routinely refusing to honor their patients' end-of-life instructions as set forth in their Living Wills. Relator knows of several instances in which life-sustaining treatments such as feeding tubes were implemented or continued in direct contravention of what was stated in a patient's living will or by the patient's Health Care Surrogate **(See Ex. #2, p. 5, 7, 35; Ex. #10, p. 36, 37)** solely for the purpose of fraudulently billing for these services. Even Defendants' corporate Ethics Committee refused to deal with the issue because of pressure placed on the Committee by corporate executives.

18

**G.    PROVIDING STAFFING WHICH IS INADEQUATE TO MAINTAIN PATIENT HEALTH**

53.    HPC Healthcare, Inc., with the aid of its subsidiary companies LifePath and Good Shepherd, has consistently provided inadequate staffing to meet the needs of patients and their families.  As a result, patients and families have not been provided the nursing, counseling, home health aid, physical therapy and chaplain visits that are required under their Plans of Care, yet Defendants fraudulently bill Medicare for such services that they are incapable of providing due to inadequate staffing levels.

54.    As part of the Medicare Conditions of Participation (42 CFR Part 418), all services must follow a written Plan of Care ("POC").  42 CFR 418.56.  The POC must contain certain frequency levels of certain services, e.g., a certain level of nursing visits per week or month, counseling visits per month, etc.  As part of the Conditions of Participation, Defendants must deliver services in compliance with a patient's POC and compliance with a patient's POC is material to Medicare reimbursement and payment of the MHB.  Defendant HPC Healthcare, with the aid of its subsidiaries, LifePath and Good Shepherd are knowingly and fraudulently billing Medicare for services which are not in compliance with a patient's POC.  Defendants are knowingly and falsely submitting claims to Medicare for the MHB for patients whose POC is intentionally changed to match inadequate staffing levels, rather than patient needs.  Additionally, Defendants have instructed its staff, including Relator, to make patient "visits" by telephone and encourage patients to decline a visit in order to falsely certify that patients are being serviced in compliance with the POC.

55.    Patients, their families, and staff, including Relator, have complained to Administrators and Compliance Officers at the Defendant companies about the inadequate staffing issue, yet nothing was done to correct the problem.  **(Ex. #2, p. 1-2).**  Because Relator

reported the staffing issue to the Defendants' Compliance Department (in June 2009) and requested protection under the Whistler Blower Protection Act, Defendants hired only a few contract nurses to assist with this significant problem. Defendants knew that the contract nurses were inadequate to cover such a large shortage of staffing for ailing patients but only did this limited act just to silence the Relator from notifying authorities any further.   Relator recalls attending meetings where overwhelmed nurses and counselors who, due to Defendants' understaffing, simply did not have the time to visit with all the patients under their care and openly admitted to altering patients' Plans of Care by decreasing the number of visits required **(See Ex. #9)** so that they would no longer be non-compliant.   Team managers were always present at these meetings and yet did nothing to discourage this practice because Diana Yates, Director of Clinical Services, as well as Cheryl Hamilton, Executive Director and Joan Strohm, Chief Clinical Officer among other senior administrators, openly instructed them to engage in and follow this wrongful practice.   In fact, the Director of Clinical Services has stated to managers that, in order to be in compliance, changing Plans of Care is an acceptable practice. **(See Ex. #2, p. 1-2, 36-38; Ex. #4, p. 12, 21-23, 37-48; Ex. #10, p. 1-7, 15-32, 39).**

56.    A very disturbing and disheartening result of Defendants' intentional under-staffing is that patients receive inadequate counseling services that should be included as part of their hospice stay.   This has caused the rate of patient suicides at Defendants' hospices to double in recent years.   In fact, Relator personally knows of an HPC internal audit which has tracked this startling increase in patient suicides, an audit which Defendants have shielded from Medicare and Medicaid and their financial intermediary, Palmetto GBA.   **(See Ex. #2, p. 38).**

57.    One example of under-serving the Spanish patients at LifePath was when an English speaking nurse was assigned to a Spanish speaking patient.  The patient was observed not understanding the instructions given to the patient by the nurse regarding how to properly administer morphine.  Because a bi-lingual counselor just so happened to observe the lethal miscommunication, the patient was spared a fatal dosage of morphine.  **(See Exhibit #15, email from Relator back in 2006 sent to Defendant management notifying them of this issue)** Ninety five percent of Spanish speaking patients and families under Defendants' care do not have a nurse or counselor who can speak their language. Relator addressed this issue and attempted to remedy the situation but Defendants have yet to remedy the situation with Spanish speaking nurses and counselors.

58.    One Spanish-speaking patient committed suicide by spreading out a blanket in his backyard, putting a plastic bag over his head, and shooting himself in the head.  The patient did this because he wanted to end suffering that was not being adequately treated by the Defendant LifePath.  LifePath failed to provide the appropriate and necessary counseling as set forth in the Patient's Plan of Care by refusing to provide staffing appropriate to meet his needs and by allowing staffing caseloads to be twice the national average in order to save costs and achieve greater profit margins.  Defendants billed Medicare for counseling services at a frequency spelled out in the Patient's Plan of Care, but did not provide these services at that frequency. This is one of many examples of patients attempting and committing suicide because of Defendants' intentional refusal to provide adequate counseling and refusing to provide professionally recognized standards of healthcare to their patients.

59.   The National Hospice and Palliative Care Organization reports that the national average for a counselor's caseload was 23 patients in 2007 while HPC averaged 50. Each counselor at HPC now carries 70-80 patients, which is three (3) times the national average. **(See Ex. #16).** Defendants have knowingly submitted false claims to Medicare for reimbursement for services under a Plan of Care which Defendants know are not and cannot be provided due to intentional understaffing.

H.   **ESTABLISHING ILLEGAL KICKBACK SCHEMES IN ORDER TO INCREASE REFERRALS**

60.   In order to elicit increased referrals from nursing homes, HPC Healthcare, Inc. provides Continuous Care (nursing care provided at the bedside 24-hours a day at a higher Medicare reimbursement) without appropriate medical necessity to many nursing home patients in violation of the anti-kick back laws provided by the Stark Act. **(See Ex. #2, p. 3-4, 32).** Because Defendants alleviate the staffing requirements for the nursing homes and assisted living facilities, the facilities show their gratitude by increased referrals between themselves and Defendants. For example, the administrator at a local assisted living facility voiced his expectation that all of his dying patients receive Continuous Care staffing by HPC Healthcare, Inc. ("HPC"), and he was assured by LifePath that this expectation would be met regardless of medical necessity. Because Relator attempted to clarify the necessary Medicare requirements for the use of the Continuous Care Program, Relator was quickly reprimanded by Irene Cohen, Clinical Manager, and Diana Yates, Director of Clinical Services, for mentioning this fact and possibly disrupting illegal referrals. This collusion by Defendants, nursing homes, and assisted living facilities is a fraudulent kick-back scheme in violation of the Stark Act, which costs Medicare millions of dollars each year.

61.    HPC Healthcare, Inc., with the aid of its subsidiary companies LifePath and Good Shepherd, has offered kickbacks in the form of cameras, free meals, and other valuable items to the nurses who generated the most referrals from their assigned nursing homes or assisted living facilities. If nurses and clinical managers met or exceeded their quotas of Continuous Care and Hospice House referrals, Defendants would not only praise, but also reward, these nurses by giving them better performance appraisals. **(See Ex. #2, p. 32-33).** An example of such a reward for referrals (kick-backs) is when Nurse Matt Skairus, on the Gold Team, received a camera from the Defendant LifePath for winning the contest providing the most referrals from his assigned nursing homes. Staff and Managers who go along with the fraud are rewarded with better performance appraisals which lead to promotions and increased salaries, thereby costing Medicare and Medicaid even more money due to the billing of more payments by Medicare for more expensive and inappropriate levels of care. Because of the incentive provided, nurses often skew the admission requirements, admitting patients who are not appropriate or qualified for admission to the hospice **(See Ex. #17, Letter from Sue Pagano, Defendant's marketing representative and Ex. #12, text message from Kim Lawrence)**. Often Defendants' nurses would solicit referrals from nursing home staff and review a potential referral's medical chart, a clear violation of the Health Insurance Portability and Accountability Act (HIPAA) and the Stark Anti-Kickback Act. **(See Ex. #10, p. 14)**.

62.    Another example of Defendants' administrative pressures occurred on January 1, 2010 when a team physician for LifePath told a team of LifePath staff to "Make patients go to the Hospice houses whether they want to or not to fill the beds because we are losing money!" **(See Ex. #2 p. 35).**

63.     Defendants' staff is paid bonuses based on meeting quotas of admissions to HPC **(See Sue's "Team News" letter to Defendant's staff, Ex. #17)**.  This practice encourages and rewards the unlawful admission of patients who do not qualify for hospice care according to Medicare criteria.  Due to this system of compensation/corruption in their illegal bonus reward program, Defendant HPC, a supposed "non-profit" company, is not only paying bonuses for referrals but paying out salaries in the hundreds of thousands of dollars to its corporate executives.  For example, CEO, Kathy Fernandez' published salary in 2008 was $650,000 **(See Ex. #18)**.

64.     HPC's acts violated the Anti-Kickback Act, 42 U.S.C. § 1320a-7b, and thus resulted in the knowing submission of false claims for reimbursement from Medicare for patients referred under an illegal kickback scheme.

I.      **INTENTIONALLY MISLEADING PATIENTS AND MEDICARE**

65.     HPC Healthcare, Inc., with the aid of its subsidiary companies LifePath and Good Shepherd, has intentionally misled patients by not informing them that they are being admitted into hospice.  Staff are instructed by Defendants not to use the word "hospice" around certain potential patients; to hide their name tags from these patients; and to openly misrepresent themselves and the Defendants by claiming that they are from a home health agency, not a hospice.  Defendants engage in this deception because often patients, or family members acting on behalf of patients, will decline the admission into hospice believing it to be premature, and Defendants do not want to risk losing potential patients and the Medicare revenue they produce. Relator knows of many instances in which a person who lacks appropriate authority signs a patient's admission paperwork, thereby denying the patient his or her rights under Medicare to informed consent.  **(See Ex. #2, p. 34; Ex. #4, p. 28, 31-32)**.  Defendants' claims to Medicare for

the services provided to these patients are false or fraudulent because the patients are enrolled in hospice without informed patient consent, in violation of Medicare Conditions of Participation.

66.     HPC Healthcare, Inc., with the aid of its subsidiary companies LifePath and Good Shepherd, has regularly instructed staff to back-date Medicare and Medicaid forms that were not signed in a timely manner. Relator knows that if a staff person refuses to comply, the manager will simply ask another staff member to back-date the form. Relator knows that forms that have been back-dated include Election Statements, Revocations, and other similar forms. **(See Ex. #2, p. 36, 39)**. These forms are material to payment by Medicare for hospice services.

67.     In addition to causing patient harm, participating in Medicare fraud, and denying patients their ability to seek other forms of treatment and care, Defendants also wrongfully coerced patients to "voluntarily discharge" before receiving expensive medical care in order to shift costs away from Defendant.

68.     Defendants' years of ongoing fraud has cost patient lives (and suicides), has deprived patients of having their right and ability to make informed decisions, caused a rise in healthcare costs, and moreover wrongfully cost taxpayers a minimum of $300,000,000.00 ($300 Million) to $600,000,000.00 ($600 Million) for violations of the False Claims Act and other laws. Specifically, because of Defendant's false statements, false and fraudulent claims, false enrollments and other illegal actions to receive payment, Medicare wrongfully paid Defendant at least $300,000,000.00 ($300M) over the last six years. Furthermore because of Defendant's ongoing illegal kick-back arrangements with facilities (in violation with the Stark Act) this unlawful referral network has caused Medicare an additional $300,000,000.00 ($300 Million) of payment to Defendants over the last six years. Therefore because of Defendant's intentional

25

violation of the False Claims Act and the Stark Act, Defendants have illegally been paid a minimum sum of $600,000,000 ($600 Million) in false claim billings over the last six years.

## Count I: Presenting and Causing to Be Presented

## False and Fraudulent Claims in Violation of 31 U.S.C. §§ 3729(a)(1)

69.     Relator re-alleges and incorporates by reference paragraphs 1 through 68.

70.     This is a claim for treble damages, civil penalties and attorneys' fees under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

71.     By means of the acts described above and from at least June, 2000 through the present, Defendants knowingly presented or caused to be presented false and fraudulent Medicare and Medicaid claims for payment or approval in violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)

72.     Defendants, by or through their agents, officers or employees, knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States Government. Defendants falsely or fraudulently submitted election statements for patients who were not terminally ill or eligible for hospice care benefits. Defendants falsely or fraudulently submitted claims for payment for hospice care benefits to which they were not entitled because the patients were not terminally ill or eligible for hospice care benefits and/or were not provided the hospice care that they signed up for.

73.     The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid and participated in payments for claims that would otherwise not have been allowed or paid.

74.     By reason of these payments, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

### Count II:  Causing and Making False and Fraudulent Claims, Records and Statements to be Presented in Violation of 31 U.S.C. §§ 3729(a)(2)

75.     Relator re-alleges and incorporates by reference paragraphs 1 through 68.

76.     This is a claim for treble damages, civil penalties and attorneys' fees under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

77.     By means of the acts described above and from at least June 2000 through the present, Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

78.     The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations, approved, paid and participated in payments for claims that would otherwise not have been allowed.

79.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

### Count III:  Conspiring to Defraud in Violation of 31 U.S.C. §§ 3729(a)(3)

80.     Relator re-alleges and incorporates by reference paragraphs 1 through 68.

81.     This is a claim for treble damages, civil penalties and attorneys' fees under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

82.     By means of the acts described above, Defendants knowingly conspired to defraud the United States by getting false or fraudulent claims allowed or paid by the United States.

83.     The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations, approved, paid and participated in payments for claims that would otherwise not have been allowed or paid.

84.     By virtue of the false and fraudulent claims made by Defendants, the United States has been damaged and continues to be damaged in substantial amounts.

### Count IV: Discrimination Claim of Relator, Nancy Chase, Against Defendant HPC Healthcare, Inc. Pursuant to 31 U.S.C. § 3730(h)

85.     Relator re-alleges and incorporates by reference paragraphs 1 through 68.

86.     This is an action pursuant to 31 U.S.C. § 3730(h).

87.     By virtue of the activities described above, Relator has engaged in conduct protected under the False Claims Act.

88.     Defendant HPC Healthcare was aware of Relator's actions.

89.     Defendant HPC Healthcare discriminated against Relator, through a demotion and reduction in pay and status, in retaliation for her aforesaid conduct protected under the False Claims Act.

90.     By virtue of this discrimination, Relator has suffered damages.

### Demand for Relief

WHEREFORE, Relator respectfully requests this Court enter judgment against the Defendants as follows:

(a)  That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false and fraudulent claims alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. "3729 *et seq.* provides;

(b)  That civil penalties be imposed for each and every false and fraudulent claim that Defendants presented to the United States;

28

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pursuing this action;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

(e) That the Relator be awarded the maximum percentage of the amount recovered by the United States as a result of this action pursuant to § 3730(d);

(f) That the Relator be awarded compensation for the retaliatory discrimination in violation of § 3730(h) in the following amounts:

> i) lost compensation based on the same seniority status as she would have had but for the discrimination;
> ii) two times the amount of back pay;
> iii) interest on the back pay;
> iv) compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees;

(g) That this Court award such other and further relief as it deems proper.

## Demand for Jury Trial

Relator, on behalf of herself and the United States, demands a jury trial on all claims alleged herein.

Respectfully submitted,

John S. Vento, Esq.
Florida Bar No. 0329381
Natalie K. Khawam, Esq.
Florida Bar No. 0027997
Mark D. Kiser, Esq.
Florida Bar No. 0420409
TRENAM, KEMKER
Post Office Box 1102
Tampa, Florida 33602
Telephone: (813) 223-7474
Facsimile: (813) 229-6553
Attorneys for Qui Tam Relator

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing False Claims Act Complaint and Demand for

Jury Trial has been furnished by *Hand-Delivery* to: **A. Brian Albritton**, United States Attorney,

United States Attorney's Office, 400 N. Tampa Street, Ste 3200, Tampa, FL 33602; **Civil**

**Process Clerk**, 400 N. Tampa Street, Suite 3200, Tampa, FL 33602 and by *Certified Mail,*

*Return Receipt Requested* to **Eric Holder**, United States Attorney General, Dept. Of Justice, 950

Pennsylvania Ave., N.W., Washington, D.C. 20530-001 on this $\underline{4^{th}}$ day of May, 2010.

_____
                     Attorney