### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA, STATE
OF FLORIDA and NANCY CHASE,

      Plaintiffs,

v.                                     Case No: 8:10-cv-1061-T-30TGW

LIFEPATH HOSPICE, INC., GOOD
SHEPHERD HOSPICE, INC., MOBILE
PHYSICIAN SERVICES, P.A.,
CHAPTERS HEALTH, INC.,
CHAPTERS HEALTH SYSTEM, INC.,
RONALD SCHONWETTER, SAYED
HUSSAIN, DIANA YATES, RICHARD
M. WACKSMAN, JSA HEALTHCARE
CORPORATION, SUNRISE SENIOR
LIVING SERVICES, INC. and
SUPERIOR RESIDENCES, INC.,

      Defendants.

---

### <u>ORDER</u>

In this *qui tam* action, Plaintiff-Relator Nancy Chase alleges that Defendants conspired to engage in a fraudulent scheme involving Medicare claims for the provision of hospice care, violations of the federal and Florida False Claims Acts. Chase also alleges that Defendant LifePath Hospice, Chase's former employer, retaliated against her for shedding light on this alleged fraud. Defendants move to dismiss Relator's fourth amended complaint on a several grounds, among them failure to state a claim under the applicable rules of civil procedure (Dkts. 145, 147, 151, 152, 154, 157, 174, and 205). Chase has

responded to the motions (Dkts. 167, 168, 169, 170, 171, 181, 191, 195), and several Defendants have replied. The Court has carefully reviewed these filings and the record and the applicable law. As discussed more thoroughly below, the Court concludes that Chase has failed to meet the heightened pleading requirement for claims alleging fraud and that this conclusion alone warrants dismissal of Chase's counts alleging False Claim Act violations. The Court also concludes that Chase has failed to adequately state a cause of action for her remaining counts of conspiracy and retaliation. And finally, the Court concludes that any further amendments would be futile and that the fourth amended complaint should therefore be dismissed with prejudice.

## FACTUAL BACKGROUND

Plaintiff-Relator Nancy Chase is a Licensed Clinical Social Worker who worked for Defendant LifePath Hospice from 1992 till late 2012. (Fourth Amended Complaint, Dkt. 79, ¶ 11). LifePath, along with Defendant Good Shepherd Hospice, Inc., is a Florida non-profit organization that provides hospice care to the terminally ill. (Id. ¶¶ 15–16). Defendant Chapters Health, Inc. is also a Florida non-profit organization, and it employs and manages professional medical staffs, to include doctors and nurses who serve LifePath and Good Shepherd's patients. All three are subsidiaries of Defendant Chapters Health System, Inc., a hospice care provider. (Id. at ¶¶ 13–17).

In her fourth amended complaint, Chase alleges that these defendants and several people within their leadership—collectively, the "Chapters Defendants"—conspired with other assisted-living and medical providers—the "Referral Defendants"—to defraud the

government by submitting Medicare claims for hospice care they did not provide or for hospice care they provided to patients who were ineligible for that care.

Hospice care is covered under Medicare for those patients who qualify as "terminally ill," meaning they are expected live no longer than six months absent a medical miracle. For a patient to qualify, federal law requires that the patient's attending physician and the medical director of the hospice program certify in writing that the patient is in fact terminally ill. (Id. at ¶ 32). Initial certifications may last up to 90 days, after which, if the patient is still alive, the attending physician and the medical director may re-certify the patient. The physician and the hospice director must also create a "plan of care" for the patient. (Id. at ¶ 35). All care that is provided during any period of certification must be consistent with the plan and medically necessary for the palliative purposes of hospice care. (Id.).

Once certified, Medicare pays the hospice provider a per-diem rate, based on the type of care being provided (e.g., routine home care, continuous home care, or general inpatient care). The hospice provider is paid for each day during which the patient is concurrently eligible for and under hospice care. According to Chase, it is this pay-per-day formula, specifically, that Defendants conspired to exploit. In her 41-page fourth amended complaint, which contains 172 factual allegations, Chase outlines how they allegedly did it.

*The Alleged Hospice Care Conspiracy*

**1.  The Chapters Defendants**

According to Chase's allegations, from June 2000 to the present, the Chapters Defendants enrolled patients in hospice care despite their knowledge that many of those patients were ineligible. And once in hospice care, the Chapters Defendants engaged in fraudulent practices to keep patients in hospice care longer than authorized by law and to provide patients with more intensive care—and thus more expensive care—than medically necessary. As stated in the complaint, the Chapters Defendants did this by directing "employees to follow practices designed to maximize the number of patients enrolled and to keep them enrolled as long as possible irrespective of their eligibility status, to create documents and records that conceal or obscure the facts and circumstances showing patients' lack of eligibility, and ultimately to maximize Medicare and Medicaid billings." (Id. at ¶ 43).

One way in which the Chapters Defendants maximized Medicare revenue was through a process of "filling the beds." Admissions nurses for the Chapters Defendants were instructed to "find a reason to admit" patients to hospice care. (Id. at ¶ 50). And if they could not find a reason, a more senior Patient Care Manager or Team Leader would. (Id. at ¶ 51).

Finding a reason often meant finding an attending physician to certify that the patient was terminally ill. Defendant Dr. Schonwetter, Chief Medical Officer for the Chapters Defendants, supplied these fraudulent certifications with the help of two of his alleged co-conspirators, Defendants Dr. Wacksman and Dr. Hussain. (Id. at ¶ 52). This

practice of referral-despite-ineligibility became so pervasive and commonplace among the Chapters Defendants, Chase alleges, that the Chapters Defendants, through their leadership, went so far as to place quotas—three per week—on patient referrals to hospice care. (Id. at ¶ 57).

Once patients were in hospice care, Dr. Schonwetter and the Chapters Defendants engaged in a process called "up-coding," inflating their patients' needs so the patients would receive more intensive care than what was medically necessary. (Id. at ¶ 42, 81). More intensive care, like continuous home care, meant larger Medicare reimbursements. (Id. at ¶ 78). The Chapters Defendants again told Patient Care Managers to "find a reason" to get patients into continuous home care. (Id. at ¶ 81). They did this by lying on medical records, a process the Chapters Defendants called "documenting the decline." (Id. at ¶ 91–98). In the one specific example Chase provides, a LifePath counselor asked Defendant Diana Yates, LifePath's Director of Clinical Services, whether she should document that her patient was riding a bike in her neighborhood; Yates responded by communicating, through a facial expression, that the counselor should not. (Id. at ¶ 98). In some instances in which they could not document the decline, the Chapters Defendants simply submitted claims for services they did not provide. (Id. at ¶ 122).

The Chapters Defendants further exploited the pay-per-day system by intentionally erecting barriers to the process of "non-recertification," the process by which a patient is found to no longer be in need of hospice care. (Id. at 60). Specifically, Dr. Schonwetter instructed staff that no patient should be considered for non-recertification before being on hospice care for 90 days, regardless of the patient's medical condition. And this attitude

trickled down the organization: when re-certification time arose, Patient Care Managers and Team Leaders from the Chapters Defendants would ask their staffs, "What can you give me?" and "How can we keep them?" (Id. at ¶ 52).

For those patients who were non-recertified, the Chapters Defendants created a program known as "Transitions," and its purpose was to closely monitor these patients with the intention of soon readmitting them and exploiting Medicare's pay-per-day revenue source. (Id. at ¶ 64).

Chase provides two examples of this effort to keep and readmit patients. In one, a unnamed nurse spoke up during a 2009 LifePath meeting and insisted that an unnamed patient had improved since admission and was no longer appropriate for hospice care; Team Medical Director Dr. Hussain allegedly instructed the nurse to make it appear in documentation that the patient was still qualified for hospice care, because, as he said, "The administration . . . is putting pressure on the physicians to keep patients even if they are not appropriate!" (Id. at ¶ 64). In the second, an unnamed LifePath patient was admitted in November 2007, discharged in May 2008, readmitted six days later, discharged in September 2010, readmitted a week later, non-recertified in May 2011, and readmitted less than a year later; Dr. Wacksman allegedly said that this patient "'should have never been admitted to hospice in the first place.'" (Id. at ¶ 66). In some instances, the Chapters Defendants submitted claims for patients who were not even in their care. (Id. at ¶¶ 116–117).

Chase further alleges that the Chapters Defendants used deceptive practices in the hospice-enrollment process in an effort to increase enrollment or continued care and thus

Medicare profits. More specifically, staff backdated hospice-election forms, declined to use the word "hospice" around patients and families wary of the term, and lied to patients about their affiliation with hospice. (Id. at ¶¶ 69-71). And these deceptions deprived patients of their ability to provide informed consent—which federal regulations require—before electing hospice care. (Id. at ¶ 73).

Chase alleges ultimately that, because of all these fraudulent practices and others, the claims the Chapters Defendants submitted to Medicare for the provision of hospice care were likewise fraudulent and in violation of the False Claims Act.

But the success of a hospice-care fraud like the one Chase alleges depends heavily on patient referrals to hospice care. The Chapters Defendants gave incentives to their employees—bonuses and better performance evaluations—to find referral sources. (Id. at ¶¶ 136–141). According to the complaint, they succeeded.

## 2.  The Referral Defendants

The Referral Defendants are other medical and hospice care-providers, [1] and according to Chase's allegations, these referral defendants assisted the fraud "by referring patients to the Chapters [] Defendants in exchange for kickbacks, including the provision

---

[1] All told, the defendants in this case are the following:

- The Chapters Defendants: (1) Chapters Health System, Inc.; (2) Chapters Health, Inc.; (3) LifePath Hospice, Inc.; (4) Good Shepherd Hospice, Inc.; (5) Ronald Schonwetter; (6) Sayed Hussain; (7) Diana Yates; (8) Richard Wacksman;

- The Referral Defendants: (9) Mobile Physician Services, P.A.; (10) JSA HealthCare Corporation; (11) Sunrise Senior Living Services, Inc.; and (12) Superior Residences, Inc.

of services the Referral [] Defendants otherwise would have to provide, payment for or provision of necessary materials and supplies, and corresponding referral of patients back in the event the patient was not re-certified for further hospice care." (Id. at ¶ 4).

More specifically, the Referral Defendants referred patients to the Chapters Defendants with the expectation that those patients would be enrolled in the more intensive continuous care service, and in return the Referral Defendants obtained the marketing advantage of being able to claim that their patients receive better treatment. One Referral Defendant, in exchange for referrals, received diapers for all its patients, even those who were not eligible hospice patients. And for other Referral Defendants, the Chapters Defendants "picked up many of the costs for the care of the[] patients" in exchange for referrals. (Id. at ¶ 158).

By knowingly accepting these benefits, Chase alleges that the Referral Defendants violated the Anti-Kickback Statute, 42 U.S.C. §§ 1320a–7b(b)(2), rendering the subsequent Medicare claims fraudulent and subjecting the Referral Defendants to liability under the False Claims Act.

***The Fraudulent Claims***

Chase does not identify any specific claim submitted to either the federal or Florida government for the provision of hospice care. Instead, she conclusively alleges their existence. For example, the complaint alleges the following: "When patients left the Chapters [] Defendants' service area and were not receiving any care from [the Chapters Defendants] or any of [their] subsidiaries, the Chapters [] Defendants kept the patients on their roster and continued to bill Medicare and Medicaid the per diem rate" (Id. at ¶ 115);

and "The Chapters [] Defendants also routinely submitted false claims to Medicaid and Medicare for reimbursement for services that they did not provide . . . ." (Id. at ¶ 117). Chase supports these conclusions inferentially. For instance, she alleges that "[r]oughly 80 percent of [the Chapters Defendants'] patients were Medicare or Medicaid beneficiaries." (Id. at ¶ 161). And "[i]f just 20 percent of the Chapters [] Defendants' Medicare/Medicaid-eligible patients were not hospice appropriate, then the Chapters [] Defendants submitted at least $20 million in false or fraudulent claims to the Government each year." (Id. at ¶ 164).

### *Retaliation*

Chase alleges that after rising to the supervisory position of Psychosocial Consultant at LifePath, she was demoted in 2009 after she raised ethical concerns about LifePath's admission and treatment of hospice patients. (Id. at ¶ 169). In 2010, she raised additional ethical concerns about the Chapters Defendants' failure to honor a patient's advance medical directives. (Id. at ¶ 170). LifePath later terminated Chase, in December 2012, after she brought her concerns about adherence to advance medical directives to LifePath's Ethics Committee. (Id. at ¶ 171). Chase alleges that she was informed that her firing was for having gone "above the chain of command." (Id.).

## PROCEDURAL HISTORY

Chase first filed this lawsuit under seal in 2010. After investigating her allegations and requesting several extensions of time for further investigation, the United States and the State of Florida declined to intervene on Chase's behalf (Dkts. 56 and 74). The operative complaint is now the fourth amended complaint, which Chase filed in March

2016, after the United States and Florida filed notices of non-intervention. In it, Chase raises four claims: Count I alleges that Defendants violated Section (a)(1)(A) of the False Claims Act and Florida's parallel statute, Fla. Stat. § 66.082(2)(a), which prohibit knowingly presenting or causing to be presented a fraudulent claim for payment to the government; Count II, also against all Defendants, alleges violations of Section (a)(1)(B) of the Act and Florida's parallel provision, Fla. Stat. § 66.082(2)(b), which prohibit knowingly making or using a false record material to a fraudulent claim; Count III alleges that Defendants conspired to violate the federal and Florida statutes; Count IV alleges retaliation against Chase's former employer, LifePath, under the federal statute, 31 U.S.C. § 3730(h); and Count V alleges employment discriminated against LifePath under the state statute, Fla. Stat. § 68.088. Defendants move to dismiss all counts.

## DISCUSSION

The False Claims Act permits private individuals to file a civil action on behalf of the United States—it is referred to as a *qui tam* action—against anyone (1) who knowingly presents, or causes to be presented, a false or fraudulent claim for payment to the United States government; (2) who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false claim; or (3) who conspires to commit such a violation of the Act. 31 U.S.C. § 3729(a)(1)(A)–(C).[2]

The Act was first enacted in 1863, and its purpose, "then and now, is to encourage private individuals who are aware of fraud being perpetrated against the government to

---

[2] Florida's parallel statute, Fla. Stat. § 68.082(2) uses nearly identical language.

bring such information forward." *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1307 (11th Cir. 2002) (citing *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1237 n.1 (11th Cir. 1999)). To this end, the Act provides that the government may elect to take over the lawsuit and that the private plaintiffs who initially filed it, known as relators, will share in the government's recovery should there be any. 31 U.S.C. § 3730(d)(1). If the government elects not to intervene, as has happened here, relators may continue to pursue the claim individually and recover between 25 and 30 percent of the proceeds from any judgment or settlement. 31 U.S.C. § 3731(d)(2).

The Anti-Kickback Statute, meanwhile, makes it a felony to offer, solicit, pay, or receive any remuneration—or "kickback"—"for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. §1320a-7b(b)(1). To incur liability, a defendant's conduct must meet the Statute's four elements: (1) knowingly and willfully; (2) paying something of value, directly or indirectly; (3) to induce the referral of individuals to the defendant for the furnishing of services; (4) paid for by a Federal health care program. *United States v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013). Because reimbursement from Medicare requires, as a precondition, compliance with the Statute and other health care laws, a relator's False Claims Act lawsuit may be predicated on an underlying violation of the Statute. *McNutt ex rel. United States v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005).[3] In order to

---

[3] Another such healthcare law is the Stark Act, 42 U.S.C. § 1395nn(a)(1)(A)–(2), which generally prohibits doctors from referring Medicare patients to hospitals with which the doctors

prevail on such a claim, however, the relator must prove the violation of the Statute and the False Claims Act. As the Eleventh Circuit recently stated, this is because "[m]erely alleging a violation of the [Statute] does not sufficiently state a claim under the FCA. It is the *submission* and *payment* of a *false* Medicare *claim* and false certification of compliance with the law that creates FCA liability." *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x. 693, 706 (11th Cir. 2014) (emphasis in original).

All twelve defendants in this action move to dismiss the fourth amended complaint, and they offer various legal theories as grounds for dismissal. For example, LifePath, Chase's former employer, argues that Chase's retaliation claim is time-barred. Other defendants argue that the fourth amended complaint is an impermissible shotgun pleading. The Court, however, will not evaluate these arguments. *See McElmurray v. Consolidated Gov't of Augusta-Richmond Cnty.*, 464 F. Supp. 2d 1327, 1346–47 (N.D. Ga. 2006) (dismissing *qui tam* action and addressing only one of five grounds raised by defendant), *aff'd*, 501 F.3d 1244. Instead, the Court will dismiss the fourth amended complaint on a more fundamental basis: that Chase has failed to state a claim for which relief can be granted. Whether subject to the lenient standard contained in Rule 8 of the Federal Rules of Civil Procedure or the heightened standard for claims alleging fraud, Chase falls short of pleading sufficient factual content to survive a motion to dismiss.

---

have a financial relationship, and which Chase also alleges was violated by virtue of the relationship between the Chapters Defendants and the Referral Defendants.

**Motion to Dismiss Standard**

**1. Rule 8**

Complaints must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. When reviewing a motion to dismiss filed under Rule 12(b)(6), in most cases courts must limit their consideration to the well-pleaded allegations and accept all factual allegations contained in the complaint as true. *See Erickson v. Pardus*, 551 U.S. 89, 93–94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007). Under this fairly lenient standard, to survive a motion to dismiss, a complaint need only contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citations omitted). This plausibility standard is met if the complaint's factual allegations permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted). And if the standard is met, the court must allow the case to proceed to discovery. *See id.*

**2. Rule 9 and Pleading Fraud with Particularity**

In complaints alleging fraud, however, "the circumstances constituting the fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). In fact, in the Eleventh Circuit, the complaint must particularize the fraud in several important respects:

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral presentations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)). Complaints alleging violations of the False Claims Act are subject to this heightened pleading requirement. *Clausen*, 290 F.3d at 1308–09. So are FCA claims predicated on violations of the Anti-Kickback Statute. *See Mastej*, 591 F. App'x. at 705–06 (citing *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009)). In this context, the Eleventh Circuit has stated the Rule 9 pleading requirement more succinctly: to state a claim under the FCA, "a plaintiff must plead 'facts as to time, place, and substance of the defendant's alleged fraud,' specifically 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Clausen*, 290 F.3d at 1310 (quoting *United States ex rel. Cooper v. Blue Cross & Blue Shield of Fla.*, 19 F.3d 562, 567-68 (11th Cir. 1994)). Moreover, because liability under the FCA attaches not to underlying fraudulent activity, but to the submission to the government of a *claim for payment*, the claims submitted to the government or the statements supporting those claims must be pled with particularity. *Id.* at 1312 (citing concurring sister circuits) (emphasis in original); *see United States ex rel. Matheny v. Medco Health Solutions Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012). As the Eleventh Circuit has repeatedly stated, the submission of a claim is "the *sine qua non* of a False Claims Act violation." *Clausen*, 290 F.3d at 1312; *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005); *Mastej*, 591 F. App'x. at 703.

In *Clausen*, for example, the relator was one of the defendant's competitors in the area of medical testing for long-term care facilities, and he alleged that the defendant had engaged in a nearly two-decades-long fraudulent scheme of performing unnecessary

medical testing on patients with government-funded health-insurance plans and then knowingly charging the government for those unnecessary tests. 290 F.3d at 1303. The relator's complaint contained patient lists, a blank health-insurance claim form known as a Form 1500, medical test codes, and allegations that improper testing would be listed on the Form 1500s and then submitted to the government for payment within a few days after the medical service had been provided. *Id.* At 1306.

Still, the Eleventh Circuit affirmed the district court's dismissal for failing to plead the fraud with particularity under Rule 9. *Id.* at 1315. The court first noted: "[N]o copies of a single actual bill or claim or payment were provided. No amounts of any charges by [the defendant] were identified. No actual dates of claims were alleged. Not a single completed Form 1500 was provided. No policies about billing or even second-hand information about billing practices were described . . . ." *Id.* at 1306. Drawing on its own precedent and that of other circuit courts, the court found that "Rule 9(b)[] . . . does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." Clausen, the court held, had done just that, and this "failure to allege with any specificity if—or when—any actual improper claims were submitted to the Government" was fatal to his case under Rule 9. *Id.* at 1311.

Importantly, the court in *Clausen* noted the difficulty of meeting Rule 9's heightened pleading requirement, especially for a corporate outsider, like Clausen, who does not have ready access to actual claims or first-hand knowledge of billing practices.

*Id.* at 1314. Yet the court still affirmed the dismissal with prejudice, finding that neither the FCA nor the Federal Rules provide a pleading leniency for those without personal knowledge. *Id.* And despite the preclusive effect of this finding, *Clausen* has been cited repeatedly in the Eleventh Circuit as providing the benchmark for pleading False Claims Act violations. *See Hopper*, 588 F.3d at 1324; *Corsello*, 428 F.3d at 1012.

**Chase's Allegations in the Fourth Amended Complaint**

**1. Allegations of Fraud – Counts I and II**

Chase falls well short of meeting the requirements of Rule 9 and the standard described in *Clausen*. Chase does not identify a single claim submitted to the government, let alone a false one. She does not identify anyone who submitted the alleged false claims she cannot specifically identify. She does not specify when any false claims were submitted. What Chase has done is describe a private scheme in detail, to include facts as to some disturbing medical practices. She has not alleged "'facts as to time, place, and substance of the defendant's alleged fraud'"—that is, a fraudulent claim. *Clausen*, 290 F.3d at 1310 (quoting *Cooper*, 19 F.3d at 567–68); *see Matheny*, 671 F.3d at 1225. As it was in *Clausen*, this failure is fatal to Chase's claim.

The court in *Clausen* also stated that, "if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of an *actual false claim* for payment being made to the government." *Clausen*, 290 F.3d at 1311 (citation omitted) (emphasis in original). Citing more recent Eleventh Circuit precedent, primarily the 2014 unpublished opinion in *United States ex rel. Mastej v. Health Management Associates, Inc.*, 591 F. App'x. 693, Chase argues that her fourth amended complaint

16

should survive Defendants' motions to dismiss because the complaint's factual allegations contain strong indicia of reliability. This argument misconstrues the precedent it cites. In fact, *Mastej* is a case in point.

There, the circuit reversed the district court's dismissal under Rule 9 even though the complaint left out critical details about the actual submission of false claims to the government—details such as dates, amounts sought in the claims, and the names of patients to which those claims referred. *Id.* at 706. The court first noted that a "relator can also provide the required indicia of reliability by showing that he personally was in a position to know that actual false claims were submitted to the government and had a factual basis for his alleged personal knowledge." *Id.* at 707 (citing *Hopper*, 588 F.3d at 1326).

In reversing the district court, the Eleventh Circuit relied exclusively on the relator's role as a corporate insider and the information to which his role gave him access. Specifically, the Court highlighted the following allegations in the complaint: (1) that, for six years, the relator was one of the defendant's Vice President of Acquisitions and Development, a period during which he "often attended weekly case management meetings in which Medicare and Medicaid patients and billing were discussed"; (2) that, during these meetings, "every patient was reviewed, including how the services were being billed to each patient"; (3) that, as a result of this role within the organization, the relator became "intimately familiar with the payor mix at the hospitals"; and (4) that, after leaving his role as Vice President, the relator served as CEO for one of the defendant hospitals, during which he was once asked by the CEO of another defendant hospital to split the cost of an unlawful kickback. *Id.* at 695–96, 707. These allegations taken cumulatively, the court

17

held, supplied a sufficient factual basis to support the relator's otherwise unparticular conclusion that the defendants "*actually submitted*" claims to the government. *Id.* at 708 (emphasis added).

*Mastej* thus never softened the focus on the *sine qua non*, the essential act, of a complaint alleging violations of the False Claims Act—the actual submission of a false claim. Instead, *Mastej* simply permits a complaint to survive Rule 9's particularity requirement if the complaint contains strong indicia of reliability *vis-à-vis* the fraudulent claim. Reliability concerning the fraudulent scheme is not enough. *See, e.g.*, 591 F. App'x. at 704 ("a plaintiff-relator without first-hand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation"). Another unpublished opinion from the Eleventh Circuit provides a good illustration. In *Hill v. Morehouse Medical Associates*, the relator was a former employee in the defendant's billing department and had "firsthand information" about the defendant's billing practices. Given this access to the "very department where she alleged the fraudulent billing schemes occurred," the court concluded that relator's otherwise general allegations that fraudulent claims were submitted daily bore the requisite indicia of reliability. 82 F. App'x. 213 (11th Cir. 2003).

By contrast, the relator in *Clausen*, as an industry competitor, could not provide enough indicia of reliability about the submission of a false claim even though he could detail more than a decade's worth of improper practices. *See Clausen*, 290 F.3d 1312. Neither could the relator in *Corsello*, a salesman for two of the defendants. 428 F.3d at 1013–14. And neither could the relators in *Hopper*, also sales representatives for the defendants in that case.

This case is less like *Mastej* and more like *Clausen*, *Corsello*, and *Hopper*. As a social worker employed by LifePath, Chase had first-hand knowledge of at least one of the Referral Defendants' hospice-admission policies and perhaps even some of its medical practices. Chase has provided the "who," "what," "where," "how," and "when" of those practices. *Cf. Corsello*, 428 F.3d at 1014. She has not done the same for fraudulent claims submitted to the government for those practices. *See id.* She has instead provided only conclusory claims of their existence supported by inference. But that inference is not supported by first-hand knowledge of billing practices. *Compare Hopper*, 588 F.3d at 1328, *with Mastej*, 591 F. App'x. at 707–08. It is not supported by the required "indicia of reliability that a false claim was actually submitted." *Mastej*, 591 F. App'x. at 704. Without this kind of support, the complaint does not survive the heightened pleading requirement of Rule 9. *See Hopper*, 588 F.3d at 1328; *see also Corsello*, 428 F.3d at 1013 ("[S]ubmission [of a false claim] must be pleaded with particularity and not inferred from the circumstances"). Chase's allegations of violations of the False Claims Act, contained in Counts I and II of the fourth amended complaint, will be dismissed.

As for Chase's allegations of fraud under Florida's False Claims Act, at least one court in this circuit has concluded that the Florida law requires the same heightened pleading standard as the federal law. *See United States ex. rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1036 (S.D. Fla. 2007). And for good reason: the statutes govern the same conduct, impose the same liability, grant relators the same stake in any potential recovery, and use nearly identical language in setting forth the elements of a violation. *Compare* 31 U.S.C. § 3729(a)(1)(A), *with* Fla. Stat. § 68.082(2)(a). For these reasons, this

Court agrees with the District Court for the Southern District of Florida that "the standards under both the Florida Act and the Federal Act are the same." *Heater*, 510 F. Supp. 2d at 1036. Chase's claims under Florida's False Claims Act will be dismissed as well.

## 2. Allegations of Conspiracy – Count III

Complaints alleging a conspiracy to violate the False Claims Act are also subject to Rule 9's heightened pleading standard. *Corsello*, 428 F.3d at 1014 ("The district court correctly dismissed [the relator's] [conspiracy count] for failure to comply with Rule 9(b)."). A defendant is liable for conspiracy if the relator can prove two elements: (1) that the defendant conspired with at least one person to get a false or fraudulent claim paid by the government; and (2) that at least one of the conspirators performed an overt act to get a false or fraudulent claim paid. *United States ex rel. Bane v. Breathe Easy Pulmonary Services, Inc.*, 597 F. Supp. 2d 1280, 1289 (M.D. Fla. 2009) (internal citations omitted). "Conspire" in this context requires a meeting of the minds "to defraud the government." *Id.* (citing *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)).

And though the Eleventh Circuit has not spoken definitively on the issue, district courts in the Eleventh Circuit—and at least one other circuit court—have held that a failure to adequately allege the existence of a false claim is fatal to a conspiracy claim. *See, e.g.*, *United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-830-AKK, 2016 WL 1270586, *7 (N.D. Ala. Mar. 21, 2016); *United States ex rel. Potra v. Jacobson Companies, Inc.*, No. 1:12-cv-1600-WSD, 2014 WL 1275501, *4 (N.D. Ga. Mar. 27, 2014); *accord United States ex rel. Vigil v. Nelnet, Inc.* 639 F.3d 791, 801 (8th Cir. 2011) ("Because the Complaint

fails to state claims under sections 3729(a)(1) and (2), it likewise fails to state an actionable conspiracy claim under § 3729(a)(3).").

This Court agrees with those courts. Because the existence of a false claim— whether ultimately paid by the government or not—is an element of a cause of action for conspiracy to violate the False Claims Act, *see Bane*, 597 F. Supp. 2d at 1289, the failure of a relator to sufficiently plead that claim's existence necessarily means that, as a matter of law, the relator cannot prevail. *See* Fed. R. Civ. P. 12(b)(6); *see also Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (approving of dismissal on a dispositive question of law). As discussed above, Chase failed to plead the existence of a false claim. For this reason alone, she has failed to state a claim for conspiracy to violate the False Claims Act.

Additionally, Chase fails to allege a meeting of the minds to defraud the government. *See Allison Engine*, 553 U.S. at 672. In the fourth amended complaint, Chase alleges that the Referral Defendants received certain benefits in exchange for their having referred patients to hospice care. But nowhere does the complaint allege a specific agreement for this benefits exchange. And more important, nowhere does the complaint allege a specific agreement to engage in this exchange for the purpose of defrauding the government. Chase's only allegation of an agreement is a conclusory assertion that "Defendants knowingly conspired" to present fraudulent claims to the government for payment. (Dkt. 79, ¶ 182). This is a bare legal conclusion that may very well fail to state a claim under Rule 8. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It

certainly fails under Rule 9. *See Corsello*, 428 F.3d at 1014. Chase's Count III alleging conspiracy will be dismissed.

### 3. Allegations of Retaliation and Discrimination – Counts IV and V

In Counts IV and V, Chase claims that LifePath violated the retaliation provisions of the federal and Florida False Claims Acts, 31 U.S.C. § 3730(h) and Fla. Stat. § 68.088. Chase pleads factual content supporting the counts in two of the complaint's 172 paragraphs. In one of them, Chase alleges that LifePath demoted her after she raised ethical concerns about LifePath's failure to honor a patient's living will. (Dkt. 79, ¶ 170). In the other, Chase alleges that she was later fired after she raised similar objections to LifePath's Ethics Committee. (Id. at ¶ 171).

These allegations fail to state a claim for retaliation under Rule 8 of the Federal Rules of Civil Procedure. The claim fails because, accepted as true, the allegations fail to allege a necessary element of the claim—namely, that Chase engaged in protected activity, which is defined as "acts done by the employee . . . in furtherance of an [FCA action] or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3170(h). In short, Chase alleges that she objected to unethical medical practices, but, critically, she does not allege that she objected to *fraudulent* medical practices. *Compare Farnsworth v. HCA, Inc.*, No 8:15-cv-65-T-24-MAP, 2015 WL 3453621, *7 (M.D. Fla. May 29, 2015) ("[the relator] does not connect her opposition to the resulting improper billing or the submission of a false claim to the government"), *with United States v. Wellcare Health Plans, Inc.*, No. 8:12-cv-2032-T-30EAJ, 2016 WL 1077359, *4 (M.D. Fla. March 18, 2016) ("[the relator]

alleges facts related to her efforts to stop what she believed to be fraud upon the government").

Though Congress amended the FCA in 2009 to broaden the scope of "protected activity" under the FCA retaliation provision, the activity must still be aimed at stopping an FCA violation. *See Wellcare Health Plans*, 2016 WL 1077359, at *4. And however disappointing they may be, unethical medical practices are not frauds committed upon the government in violation of the FCA. *See Hopper*, 588 F.3d at 1328 ("Improper practices standing alone are insufficient to state a claim under [the False Claim Act] . . . ."). Internal complaints shedding light on those unethical practices, without more, do not qualify as protected activity. *See Farnsworth*, 2015 WL 3453621, at *7.

The only allegation in the fourth amended complaint connecting Chase's internal complaints to fraud against the government is a single allegation stating that Chase was demoted "because she raised ethical issues concerning violations of the [False Claims] Acts." (Dkt. 79, ¶ 169). This is a legal conclusion couched as a factual allegation, and the Court need not accept it as true. *See Twombly*, 550 U.S. at 555. And because it is not supported by the other well-pleaded allegations of retaliation, the Court will not. Chase's well-pleaded allegations fail to establish that she engaged in protected activity. For this reason, her retaliation claim under the FCA will be dismissed. Chase's discrimination claim under Florida's False Claims Act will be dismissed on the same grounds. *See Heater*, 510 F. Supp. 2d at 1036.[4]

---

[4] Chase's Florida discrimination claim suffers from another flaw, albeit not in itself a fatal one. Chase's Count V states a cause of action under the retaliation provision of the Florida False

Throughout her complaint, Chase alleges the existence of widespread medical abuses committed by hospice-care and other medical providers. She fails, however, to allege the connection between those abuses and the existence of false claims submitted to the government for payment. Later in her complaint, Chase alleges that she objected to the medical abuses she became aware of. She fails, however, to allege the connection between the practices she objected to and the commission of fraud against the government. Chase's fourth amended complaint, Counts I through V, will be dismissed.

**Leave to Amend**

Rule 15(a) of the Federal Rules of Civil Procedure governs the determination of whether plaintiffs who fail to state a cause of action, like Chase has here, should be given leave to amend their complaint. The rule states that courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). And ordinarily, courts should give plaintiffs at least one opportunity to amend before the court dismisses the complaint with prejudice. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citing *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001)). Leave should not be given, however, in a few circumstances: "(1) [when] there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) [when] allowing amendment would cause undue prejudice to the opposing party; or (3) [when]

---

Claims Act, Fla. Stat. § 68.088. That provision, however, does not provide a basis for a cause of action. *McShea v. School Bd. of Collier Cnty.*, 58 F. Supp. 3d 1325, 1345 (M.D. Fla. 2014). Rather, it permits a cause of action under Florida's Whistleblower Statute, Fla. Stat. § 112.3187.

amendment would be futile." *Id.* (internal quotations marks and citations omitted). A district court's denial of leave to amend is reviewed for an abuse of discretion. *See id.*

Chase first filed this lawsuit in 2010 and has filed, in total, five complaints. The Court has already granted leave to amend twice. (Dkt. 25; Dkt. 73). While the Court is mindful that these grants of leave were not predicated on a previous failure-to-state-a-claim dismissal, the Court is also mindful that the law on the subject has not changed since Chase first filed her complaint. The precedent compelling dismissal today is the same precedent that could have served as a model for Chase's first, second, third, fourth, and now fifth complaint in this case. Chase has had, in other words, repeated chances to cure the deficiencies in her complaint. She has failed to do so, and this finding alone is reason enough to deny leave to amend her fourth amended complaint. *See id.* ("repeated failure to cure deficiencies by previous amendments is an explicitly permitted reason" for denying leave to amend) (brackets and internal quotation marks omitted). Moreover, given this long procedural history and the fact that Chase still falls short of alleging the particularity required to survive a motion to dismiss, the Court is convinced that any future amendment would be futile. *See id.* at 1011 ("Because . . . a third amendment of the complaint more than five years after the commencement of this action would have been futile, we affirm."). The fourth amended complaint will be dismissed with prejudice.

For the reasons discussed above, it is ORDERED AND ADJUDGED that:

1.   Defendants' Motions to Dismiss (Dkts. 145, 147, 151, 152, 154, 157, 174, and 205) are GRANTED.

2.   The case is DISMISSED WITH PREJUDICE.

3.      The Clerk is directed to close this file and terminate any pending motions as

moot.

**DONE** and **ORDERED** in Tampa, Florida, this 22nd day of September, 2016.


_____

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>Copies furnished to:</u>
Counsel/Parties of Record